THE STATE OF IOWA, Appellee, v. F. W. SELLS, Appellant.

Assault with intent to rape: CORROBORATION: *Corpus delicti:* EVI-
DENCE. Conviction of a charge of assault with intent to rape can
not be had upon the testimony of the complaining witness
alone; there must be evidence from some other and independent
source corroborating her testimony, and tending to connect the
defendant with the offense. This may consist of statements al-
leged to have been made by defendant to others concerning the
alleged assault, and if they can be fairly construed into an
admission of guilt, or of any other fact fairly tending to con-
nect him with the offense, it will constitute sufficient corrobora-
tion to take the case to the jury. In the instant case the evi-
dence is reviewed at length and it is held insufficient as proof
of the *corpus delicti,* and insufficient as corroboration of the
prosecution, and that as a matter of law a conviction of guilty
can not be sustained.

*Appeal from Clarke District Court.*—HON. H. M. TOWNER,
Judge.

THURSDAY, FEBRUARY 10, 1910.

INDICTMENT for assault with intent to commit rape.
Verdict and judgment of guilty, and defendant appeals.—
*Reversed.*

*Temple & Temple, J. H. Jamison, L. E. Crist,* and
*J. A. Penick,* for appellant.

*H. W. Byers,* Attorney-General, and *C. W. Lyon,* As-
sistant Attorney-General, for the State.

WEAVER, J.—The case to be here considered is an un-
usual one in many of its features. It was tried in the
court below with an eminent degree of fairness, and, aside

from certain minor propositions which we need not consider, is presented here upon an exception to the sufficiency of the evidence, and especially to the sufficiency of the corroboration.    The defendant is a physician residing and practicing his profession at Osceola in Clarke County, where he maintained a private hospital or sanitarium at which, at the time in question, there was employed a Miss Sampson as nurse, or assistant.    At the date of the alleged offense defendant was thirty-eight years old, married, and living with his wife.    He had been practicing medicine about fifteen years, most of the time in Clarke County. His character and reputation prior to the charge made in this case have not been put in issue, and he is entitled to the presumption that they were good.    Miss Hartman, the person upon whom the alleged assault was committed, was then an unmarried woman about twenty-three years of age, and had not resided in Clarke County until June, 1908, when she came to Osceola to visit the family of a cousin living there.    She had for a time been a student in college, and had also been employed as a stenographer.    Her character for truth and virtue is also unimpeached.    The circumstances of the alleged crime as stated by her are substantially as follows:

Soon after her arrival in Osceola she found herself troubled with slight deafness, and when she spoke of it to her cousin, Mrs. Smith, the latter said that Dr. Sells was her family physician and requested that Miss Hartman consult him.    On June 27th, the two women went to the doctor's office at the sanitarium and made known their errand.    He made a somewhat superficial examination, suggested that the trouble probably arose from catarrh, and after applying a remedy suggested that she return on the following Monday, June 29th.    On the date so fixed she returned to the sanitarium alone.    At one place in her testimony she says that upon this visit she found other patients there for treatment, but recurring to the subject later she

states that she saw no one else there except Miss Sampson
whom she met or saw for a moment in the hall.    Defend-
ant gave her a treatment substantially as on the first visit
and engaged her in a conversation in which he told her she
was in a worse condition than she suspected.    He said her
trouble had its cause in "the displacement of the private
organs," and that he "had cured a girl in that way."    She
further says he produced a book which he said would illus-
trate her ailment and in so doing he opened the volume
of "pictures of nude men and women and while he didn't
explain anything he left it for her to see."    He also showed
her "specimens in small glass jars, and a skeleton," and
told her they "pertained to the trouble he had been talking
about."    Before she departed he told her he would have to
make further examination with electricity and made an ap-
pointment for her return for that purpose on Wednesday,
July 1st.    When that day arrived she went again to the
sanitarium alone.    Arriving there she saw nothing of Miss
Sampson and went alone with the doctor into what she calls
"the dark room" where he again examined her ear and
nose and put some liquid in her mouth which he told her to
swallow.    He then directed her to go into a bathroom, but
a few feet away, and remove her clothes and put on a
kimona which was there.    She followed his direction, re-
moved all her dress except the "lower portion of her under-
clothes."    While putting on the kimona she felt sick (which
she attributes to the medicine or liquid the doctor had given
her) and sat down upon a lounge or couch which was in
the bathroom.    While sitting there the doctor came in with
a cloth in his hand and told her to lie down on the couch,
which she did, when he opened the kimona and placed the
cloth which was saturated with something that "smelled
like alcohol" upon her breast.    Then, she says, "he sat over
me and was talking and I felt like I was going down, down
and down and lost my senses."    She claims to have re-
tained some degree of consciousness for a time and to

realize that defendant removed the remainder of her underclothes and examined her person when she became wholly unconscious, though as it seemed for "an instant" only, and when she aroused from her stupor found the doctor lying upon her with his own clothing partially removed. She freed herself from him and he left the room for a time while she dressed. Then he returned and conversation ensued in which he laughed over the transaction and boasted of his conquest over another girl who had "vowed she would never let a man touch her."

After he had detained her a short time, she promised him to return later, though she says she gave the promise in order to get away and without any intention to visit him again. As she left he said to her, "You will need a friend in a month and you better come back to me." On returning to her cousin's house she felt sick and had pain in her back. On the evening of Thursday she told Mrs. Smith of the alleged assault and at a later time when she met her parents informed them also. On Friday she again went back to the sanitarium alone. Being asked to explain the reason of this visit she says: "Well, I had consulted Mrs. Smith and I thought he had probably accomplished his purpose to ruin me, and I thought I would need a friend in a month and I had better go back and find out." Elsewhere she says that she at no time had any knowledge or consciousness that her person had been penetrated; that there was nothing in her physical condition to indicate such a thing, and after talking with Mrs. Smith she concluded that the defendant had not accomplished his purpose. On this last visit to the defendant, and with no other person in the sanitarium, she went with him into the dark room where he treated her again for her deafness. She did not ask him whether he had accomplished intercourse with her at the time of the alleged assault, but says she asked him "why he had done what he had done the time before," and according to her statement he did not reply except to ask

her, "What do you take mankind for? Not one is to be trusted. I am not to be trusted." She then went away promising him she would return on Tuesday, but did not do so, and swears she did not intend to go. When leaving the defendant on that occasion she borrowed or accepted from him an umbrella, which she took to Mrs. Smith's. As to the comparatively unimportant occurrences upon the first visit June 27th, she is corroborated in most respects by Mrs. Smith, who accompanied her. For the corroboration which the statute requires tending to connect the defendant with the commission of the alleged offense on July 1st, the state relies upon the following: Two witnesses, Mr. Jackson and wife, relate a conversation with the defendant after he had been accused of the offense. He then insisted upon his innocence, and explained that upon Miss Hartman's visit to him he had removed an obstruction from her ear, that she had seen the skeleton and was nervous, and in the course of the treatment she had fainted and remained in that condition for some time. He expressed a desire to get into communication with her or her friends and suggested that Mr. Jackson see them for him and find out if the matter could not be made right. Mr. Smith testifies that after the story got abroad the defendant called upon him and asked what Miss Hartman had said and whether she accused him with having intercourse with her. The witness answered him in the negative, but told defendant what she had said in regard to his treatment of her. Defendant explained that he did show her on one of her visits some pictures and a skeleton which startled her and that he did so because of some questions she asked him. During this conversation he said: "I might have done what I should not have done" or "I probably did things I should not have done" or words to that effect. He also asked where Miss Hartman was and "what kind of man her father was" and whether he was one "who could be talked to as a conservative man about the matter," and said he

would like to get it settled and hushed up and would "do anything in his power to fix it up."

On the other hand it should also be said that defendant denies having made any assault upon the prosecuting witness or any improper advances or suggestions, and denies the disrobing and the bathroom scene in every detail. He is supported in this denial by the attendant nurse who swears she was present at each visit by Miss Hartman to the sanitarium. It was part of her business to keep a record of patients visiting the sanitarium for advice and treatment. She produced the record kept by her showing that on June 27th, the date of Miss Hartman's first visit, there were twenty-two different patients treated by the defendant at that place; on June 29th, the date of her second visit, there were seventeen; on July 1st, the date of her third visit, there were ten, and on July 3d, the date of her last visit, thirteen. The witness says she was present and saw Miss Hartman at each visit and was present and assisted the defendant in treating her on Wednesday, July 1st, when it is claimed the assault occurred. According to her statement, she prepared a wash to be used in the treatment of Miss Hartman's ear and the three went together to the treatment room. There the defendant cleansed the ear with a syringe with the result that an obstruction was removed followed by a discharge of pus and the patient appeared to be sick or faint; they took her into the room containing the bath and placed her on an operating table which was there kept and her treatment was there continued. For a time she showed signs of delirium and the nurse remained with her applying restoratives and cleansing her face and neck from the pus. In doing this she opened the patient's dress at the neck and bathed her throat. In twenty or thirty minutes she recovered and went home alone. The doctor was not alone with her at any time after the treatment. The treatment given her on Wednesday was repeated by the defendant and nurse at the time of her last visit,

Friday, July 3d.   Other evidence was introduced by both state and defense but presents nothing adding very materially to the case as developed by the evidence of which we have here given a condensed statement.

The vital question to consider is whether the evidence, corroborating and otherwise, is sufficient to sustain a conviction.   Under the statutes of this state defendant can not be lawfully convicted of the crime here charged upon the testimony of the complaining witness alone.   To sustain a verdict of guilty her testimony must be corroborated by other evidence from some other and independent source, "tending to connect the defendant with the commission of the offense."   Code, section 5488.   It will be noticed that the corroborating evidence relied upon in this case consists wholly of statements alleged to have been made by the defendant to others after the alleged assault, and if these statements or any of them can fairly be construed into an admission of guilt, or of any other fact which fairly tends to connect him with the commission of the offense, it is sufficient corroboration to take the case to the jury. *State v. Cassidy*, 85 Iowa, 145.

After much deliberation we are persuaded that the record contains no corroborating testimony tending to connect the defendant with the commission of the crime charged and that the statements attributed to him can not under the circumstances of this case be reasonably construed into admissions of the truth of the charges made against him. The probative force and effect of a given fact or circumstance depends very largely upon its setting and that which under some conditions would carry with it the effect of conclusiveness of guilt, may under other conditions be wholly without weight or significance in that direction.   For instance, while opportunity alone is in no case sufficient corroboration yet opportunity is a material fact, and it may cut a vastly greater figure in some cases than in others. For instance, if it were claimed that defendant assaulted

the prosecuting witness in her own home or in some other place where he had no legitimate errand, proof that at or near the time in question he was seen to enter the room or place where the alleged offense occurred, and that later he made ambiguous or misleading statements concerning his conduct, would reasonably justify a finding of his complicity in the crime. On the other hand, if, as in the case at bar, the offense is charged to have been committed in his own home or office where he had an undoubted right to be and in a room or place where he was accustomed to meet visitors or transact business with patrons, upon one of whom the assault is said to have been made, no possible sinister significance can be given to the mere fact of his presence there, and the corroboration which will satisfy the requirement of the law in such a case ought to be more direct and satisfactory than would be held sufficient were he a trespasser or an intruder. Again, if the story of the prosecutrix be in all respects clear, consistent, and natural, and convincing to the unprejudiced mind, if it has the "ring of truth," corroboration might be held sufficient which would not be sufficient where her testimony is neither clear, consistent, convincing, or natural. We are not unaware that this discussion leads us close to the border line beyond which all these considerations must be left to the jury, but the court sits to see justice done to the accused as well as to the state, and if the *corpus delicti* though having some support in the evidence is dependent on proof of glaringly doubtful and uncertain character and is supported by corroboration of such weakness and inconclusiveness that a conviction thereon shocks the conscience and makes it reasonably apparent that there has been a failure of justice, a new trial should be ordered.

The case as made by the state is extraordinary, if not unparalleled, in the record of criminal trials. If the jurors accepted the truth of Miss Hartman's story they were required to believe that this young woman, presumably sane

and virtuous, who had passed the age of inconsiderate girl-hood and was not without experience in the world, after having her modesty shocked by the act of the doctor in displaying indecent pictures, on the occasion of her first visit alone to his office, returned there two days later for the purpose of a physical examination, without taking a companion or requesting the doctor to furnish one, went with him alone and without murmur into a secluded room, obeyed without protest his direction to strip herself of prac-tically all her clothing, and then after suffering at his hands the foulest indignity to which a modest woman can be sub-jected, and having escaped from her assailant's power and found refuge with her friends, returned once more, alone and unprotected, to the home of the wicked ravisher, again went with him alone into the same room where she had been conducted and abused on the former occasion, and again submitted herself to professional treatment by him. It is within the realm of human possibilities that this extra-ordinary story is true, and is therefore not the province of this court to characterize it as false, but it is so full of im-probabilities and the conduct of the prosecutrix as por-trayed by herself so repugnant to all the instincts, fears, and inclinations of the normal woman with whom the civ-ilized world is familiar, that the court may and should in-sist that it be well and substantially corroborated before branding the person so accused as a dastardly criminal.

Nor is the explanation which she gives for her last visit to the defendant the least remarkable of the many in-explicable features of the case. She says she went "to ap-peal to him and ask him what he had done," yet in the in-terview thus sought she did not ask the question. More-over she declares that she had no evidence or reason to be-lieve that actual rape had been committed upon her, and upon this fact she had already been reassured by her con-sultation with Mrs. Smith before she sought the defendant. But assuming that she really feared that while in an un-

conscious condition the defendant had committed rape upon her, how can we conceive of an innocent young woman, smarting under the sense of unspeakable outrage upon all her maidenly sensibilities, seeking a private interview with the man who had taken dastardly advantage of her helplessness, to ask him what he had done? Taking the strangeness of this story in connection with the presumed uprightness of her character together with the tendency of the evidence on both sides to show that at the visit of July 1st the prosecutrix became for a time unconscious or delirious, it seems not an unreasonable theory that she is the victim of an hallucination by which the vagaries of an abnormal and distorted imagination have been impressed upon her mind as the memory of an actual experience. Upon the theory of hallucination and a feeling of uncertainty on her part as to the fact or nature of the occurrences of July 1st, and a consequent desire on her part to satisfy herself concerning it, we may explain with some degree of plausibility her voluntary return on July 3d to the man whom she accuses of assaulting her. Otherwise we confess that explanation is impossible except upon some supposition which is inconsistent with the presumptions to the protection of which she is entitled, and this we shall not indulge in. It is to be said for the prosecutrix that the record discloses no attempt or inclination on her part to use the charge against defendant as a means of extortion from him or profit to herself, but this fact only adds perplexity to the situation, and emphasizes the conclusion that the case should have that further examination which can only be had by the granting of a new trial.

Turning to the statements of the defendant which are relied upon to corroborate the prosecutrix, they have no significance without reference to the circumstances under which they were made. Defendant was a physician settled in an apparently successful practice of several years growth, and his position in society, his standing and reputation in

his profession, his prospects for the future, the happiness of his family and all that makes life attractive to an honorable man was put in imminent peril by the charge which was beginning to be whispered about. If guilty he was of course entitled to no sympathy. If innocent, it still stood him in hand to bestir himself for protection against the scandal. It is unfortunately true that such an accusation, however false, especially when made against a professional man whose business calls him into frequent dealing and association with women, is always injurious, and often ruinous to him against whom it is directed. So true is this that physicians of the very highest character have sometimes been led to submit to imposition and to compromise with their accusers rather than take the chances of irretrievable injury from public attack upon their personal or professional reputation. That the defendant should show signs of anxiety over the story imperiling his good name and should seek the young woman and her friends, and, while asserting his innocence, ask if there were not some way in which the matter could be fixed and the scandal suppressed, may not argue very well for his judgment, but it is just as consistent with the theory of innocence as with that of guilt. Moreover much of the so-called admissions by the defendant is directed to matters which she says occurred on June 29th and has no necessary significance or bearing with reference to the alleged assault which was committed, if at all, on July 1st.

It should also be said in the defendant's behalf that, so far at least as appears from the surface, he had taken reasonable precaution to protect both himself and his female patients from liability to scandal of this nature. His profession is an honorable one and one which brings its votaries into the closest and most intimate relations with their clientage. That he had established a hospital in which to receive and treat patients was certainly not to his discredit. He had employed a woman nurse as an attendant in the

hospital who had access to its various rooms and depart-
ments and assisted him in the care and treatment of those
coming to employ his services. More than this could hardly
be expected of a physician practicing in a small country
town. Whether both he and the nurse were present at the
visits of the prosecutrix on June 29th, July 1st, and July
3d is of course a disputed proposition, the truth of which
we need not consider, but the arrangement of the building,
the employment of the nurse therein, her general duties
about the premises, the coming every day of from ten to
twenty or more patients, who had entrance to the build-
ing, and were treated therein, reduce the probability that
rape or assault with such intent could have been commit-
ted there in the manner claimed by the state. Further dis-
cussion is unnecessary. Our views may be summed up in
the single proposition that the case made by the state is
marked by so many weaknesses and inconsistencies in the
proof of the *corpus delicti* and in the required corrobora-
tion of the prosecutrix that we must hold as a matter of
law a verdict of guilty thereon can not be sustained.

Ordinarily, where a case is to be remanded for a
second trial, we do not express any opinion upon the testi-
mony, but this can not be avoided where the sole question
is upon the sufficiency of the proof. The judgment below
must therefore be reversed, and cause remanded for a new
trial. It is proper, however, for us to suggest that if the
state finds itself unable to offer other or additional or fur-
ther proof in support of the indictment, it will be advisable
for the prosecution to enter a dismissal.—*Reversed.*